FILED

2010 Jul-01  PM 01:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **VICTORIA A. LITTLE,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:08-cv-1050-JHH** |
| | | **2:09-cv-452-JHH** |
| **IBM SOUTHEAST EMPLOYEES'** | ) | |
| **FEDERAL CREDIT UNION,** | | |
| | ) | |
| **DEFENDANT.** | | |

## MEMORANDUM OPINION

The court has before it the April 14, 2010 motion (Doc. # 24) of Defendant IBM Southeast Employees' Federal Credit Union (hereinafter "Credit Union" or "Defendant") for summary judgment. Pursuant to the court's orders of April 15, 2010 (Doc. # 26), May 4, 2010 (Doc. # 28), and May 26, 2010 (Doc. # 32), the motion for summary judgment is now under submission and is considered herein without oral argument.

Having considered the briefs and evidentiary submissions, the court finds that the Credit Union's motion for summary judgment is due to be granted for the reasons outlined below.

1

## I.    <u>Procedural History</u>

Plaintiff Victoria A. Little commenced this action on June 13, 2008 by filing a complaint (Doc. # 1) in this court, generally alleging race discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981. On March 27, 2009, Plaintiff filed an unopposed motion (Doc. #15) to consolidate her claims raised in the complaint filed in this court, 2:09cv1050-JHH, with the claims raised in the complaint filed in Judge Proctor's court, 2:09cv452-RDP, on the grounds that both cases "assert and involve common questions of law and fact and will involve the same witnesses, parties, and attorneys."  The motion (Doc. #15) was granted on April 8, 2009, and the cases have since been consolidated for all purposes. (*See generally* Doc. # 16).  The consolidated case continues to assert claims for racial discrimination and retaliation under Title VII and §1981.  Specifically, Plaintiff asserts that the Credit Union disciplined her and terminated her based on her race and in retaliation for her complaints of alleged discrimination.

Defendant's April 14, 2010 Motion (Doc. # 24) for Summary Judgment asserts that no genuine issue of material fact exists and that the Credit Union is entitled to judgment as a matter of law as to all claims asserted against it.

The parties have each filed briefs and submitted evidence in support of their respective positions concerning the pending motion for summary judgment.  On April

14, 2010, the Credit Union submitted evidence[1] (Doc. # 24, Exhs. A-F) in support of

the motion and also filed a supporting memorandum brief (Doc. # 25).  Plaintiff

submitted evidence[2] (Doc. # 31, Exhs. 1-23) in opposition to the motion for summary

judgment on May 26, 2010 and on the same date filed an opposing brief (Doc. #30).

Finally, on June 1, 2010, the Credit Union filed a reply (Doc. # 34) to Plaintiff's

response in opposition to Defendant's motion for summary judgment.

## II.    Legal Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if

the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact

---

[1] Defendant Credit Union submitted: the deposition of Plaintiff Victoria A. Little with attached exhibits (Exhibit A); the deposition of Nicole Heffelfinger with attached exhibits (Exhibit B); the deposition of Patti Munro with attached exhibits (Exhibit C); the deposition of David Lyons with attached exhibits (Exhibit D); the deposition of Donna Leto with attached exhibits (Exhibit E); the declaration of Nicole Heffelfinger with attached exhibits (Exhibit F).

[2] Plaintiff submitted in support of the opposition to summary judgment: November Daily Sign in Monthly Report (Exhibit 1); Plaintiff's September 26, 2007 E-Mail (Exhibit 2); Defendant's November 30, 2007 EEOC Position Statement (Exhibit 3); Heffelfinger's August 22, 2007 Handwritten Notes (Exhibit 4); Plaintiff's September 25, 2007 E-Mail (Exhibit 5); Patterson written complaint (Exhibit 6); Plaintiff's October 5, 2007 EEOC Charge (Exhibit 7); Plaintiff's November 5, 2007 E-Mail (Exhibit 8); Plaintiff's December 10, 2008 Employee Performance Review (Exhibit 9); December 31, 2007 Written Warning (Exhibit 10); Plaintiff's Response to Written Warning (Exhibit 11); Branch Cash Balance Sheet (Exhibit 12); Leto's May 23, 2003 Written Warning (Exhibit 13); May 10, 2007 E-Mail from Heffelfinger (Exhibit 14); May 25, 2007 E-Mail from Heffelfinger (Exhibit 15); Plaintiff's June 22, 2007 Highlight Award (Exhibit 16); July 2007 Survey Results (Exhibit 17); September 25, 2007 E-Mail from Heffelfinger (Exhibit 18); October 2, 2007 Performance Improvement and Monitoring Plan (Exhibit 19); Plaintiff's Typed Notes (Exhibit 20); Heffelfinger's December 4, 2007 E-Mail (Exhibit 21); Lyons Affidavit (Exhibit 22); and Plaintiff's January 11, 2008 EEOC Charge (Exhibit 23).

3

and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met her burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge her initial burden depends on whether that party bears the burden of proof on the issue

4

at trial.  *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  *See Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, she can satisfy her initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-

movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets her initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). The court is aware that the summary judgment rule applies in job discrimination cases just as in other cases. *Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th Cir. 2000) (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

## III.   Relevant Undisputed Facts[3]

### A.   Introduction to the Business of the Credit Union

The Credit Union is a federally chartered, member-owned, not-for-profit

---

[3] If the facts are in dispute, they are stated in the manner most favorable to the Plaintiff. *Fitzpatrick*, 2 F.3d at 1115.

financial institution providing financial services to IBM employees, retirees, and their families. (*See* Heffelfinger Decl. at ¶ 1). Headquartered in Boca Raton, Florida, the Credit Union employs approximately 240 employees and maintains branches in Florida, Georgia, and Alabama. (*See* Heffelfinger Decl. at ¶ 1).

The Credit Union maintains an Equal Employment Opportunity policy that strictly forbids unlawful discrimination. (*See* Heffelfinger Decl. at ¶ 2; *see also* Exh. A to Heffelfinger Decl.). The Credit Union also maintains a written Sexual Harassment and Discrimination Policy, which provides that the Credit Union does not and will not tolerate conduct that creates a hostile work environment and that retaliation against an employee making a complaint is strictly prohibited. (*See* Heffelfinger Decl. at ¶ 2; *see also* Exh. A to Heffelfinger Decl.). Managers and employees of the Credit Union are trained on these policies annually. (*See* Heffelfinger Dep. at 33; *see also* Munro Dep. at 311-12; Lyons Dep. at 28-29; Leto Dep. at 48-50). Plaintiff Victoria Little received the Credit Union's employee handbook and Sexual Harassment and Discrimination policy, and signed an acknowledgment form that she received and understood those policies. (*See* Pl. Dep. at 73-75; *see also* Exhs. 2, 3 to Pl. Dep.).

## B.     The Structure of the Birmingham Branch

Plaintiff Victoria Little was hired as a Members Services Representative

("MSR") at the Birmingham branch of the Credit Union in October 2006 by Patti Munro, a white female, who was then Vice President of Operations for the Northern Region.  (*See* Pl. Dep. at 43-45).   The Birmingham branch is staffed by three employees, a Branch Operations Supervisor and two MSRs.[4]  (*See* Pl. Dep. at 45-47; *see also* Heffelfinger Dep. at 13-16).

The Branch Manager, Nicole Heffelfinger,[5] is responsible for hiring, firing, discipline, evaluations, and recommendations for improvements in productivity. (*See* Munro Dep. at 26; *see also* Lyons Dep. at 113-14; Leto Dep. at 36-37, 44, 79-80, 131).  However, Heffelfinger is not housed in Birmingham.  (*See* Lyons Dep. at 113). Instead, the on-site Branch Operations Supervisor, as relevant hereto, Donna Leto, is responsible for the nuts and bolts over the daily operation of the facility, assisting Branch Managers in administering daily operations, disseminating information to the employees about the technical aspects of their jobs, and recommending improvements in productivity; that is, the Branch Supervisor "oversee[s] operations."  (*See* Munro Dep. at 26; Lyons Dep. at 113-14; Leto Dep. at 36-37, 44, 79-80, 131).   A Member Services Representative's job is to welcome members to the Credit Union and deliver

---

[4] Lauren Overton, a white female, was the other MSR working with Plaintiff during the relevant time frame.  (*See* Pl. Dep. at 45-46, 205).

[5] Heffelfinger became the Branch Manager responsible for Birmingham in April 2007.  (*See* Pl. Dep. at 48; *see also* Heffelfinger Dep. at 12-16).

8

excellent service by identifying member needs and financial solutions. (*See* Heffelfinger Decl. at ¶ 3). A MSR also processes loan applications, makes loan decisions, processes transactions, and makes account changes according to member requests and Credit Union policies and procedures. (*See* Heffelfinger Decl. at ¶ 3).

There is some confusion in the record as to who the MSRs were to report to on a daily basis. When asked who she reported to, Plaintiff testified "the person that we [the MSRs] reported to was Donna Leto, as supervisor of the branch. Ms. Heffelfinger was the branch manager acting out of Atlanta." ( Pl. Dep. at 48-49). Heffelfinger testified that Leto supervised Plaintiff and the other MSR at the branch. (*See* Heffelfinger Dep. at 26, 50). But Leto was not officially responsible for disciplining and evaluating the MSRs. (*See* Munro Dep. at 26; *see also* Lyons Dep. at 113-14; Leto Dep. at 36-37, 44, 79-80, 131). Despite that fact, Plaintiff testified that Leto did evaluate Plaintiff's performance in writing one time, approximately three months after the commencement of Plaintiff's employment with the company,[6] and that Leto did discipline Plaintiff. (*See* Pl. Dep. at 49-52, 71, 206). Plaintiff's

---

[6] The Credit Union maintains that Leto was not responsible for conducting performance evaluations and was only able to verbally reprimand employees related to operations issues. (*See* Lyons Dep. at 113; *see also* Leto Dep. at 44). However, because this is a disputed fact, it is stated in the manner most favorable to Plaintiff.

What is undisputed is that in July 2007, Branch Manager Heffelfinger completed a favorable performance evaluation for Plaintiff. (*See* Pl. Dep. at 219). "July was a good month! Good job!" (*See* Doc. #31, Exh. 17).

testimony sheds some light on the role that Leto played in disciplining the MSRs:

> Q:   Okay.  What kind of discipline action did Ms. Leto provide to you?
>
> A:   She would just kind of write things out and say that, you know, "This is what's happening," or something like that.  She was, let's see, I don't want to say secretive, but, you know, been doing unawares to us, instead of saying, "Okay, this is what needs to be done," maybe she would write that up and give it to the manager or something like that, and we would hear it, you know, days or weeks later.
>
> Q:   Okay.  So it wasn't that Ms. Leto was issuing you a piece of paper that said, "Here's something you've done wrong."  It was your thought that she was telling the branch manager –
>
> A:   Yes.
>
> Q:   – who then, in turn, would issue that discipline to you, correct?
>
> MS. WILKINSON:   Object to the form.
>
> A:   And actually –
>
> MS. WILKINSON:   Go ahead.
>
> A:   – there was some, I guess, discipline.  At one point, she – we would go to – if we didn't know what to do or if we had questions, of course, we went to Ms. Leto, because she was our supervisor.
>
>      . . .

(Pl. Dep. at 50-51; *see also* Pl.'s Exh. 1 to Pl. Dep.).

## C.   Plaintiff's Performance in the Fall of 2007

In mid-September 2007, Birmingham Branch Manager Heffelfinger learned from Branch Supervisor Leto that Plaintiff was often tardy but was not recording late arrivals in her time records, and that both MSRs were having a problem with

punctuality.[7]  (*See* Heffelfinger Decl. at ¶ 4; *see also* Heffelfinger Dep. at 94, 198).

The genesis for the punctuality problem was apparently this – Plaintiff and Lauren

Overton, the other MSR, had been told by Leto that they had a fifteen minute grace

period in the morning before they were considered tardy, and as a result, both were

tardy on several occasions.  (*See* Heffelfinger Dep. at 93-95, 198, 202; *see also* Pl.

Dep. at 169).   In fact, there exists no grace period for late employees.  (*See*

Heffelfinger Dep. at 94, 198, 202).  As a result, on September 19, 2007, Heffelfinger

met with all Birmingham branch employees to ensure they understood that the Credit

Union's attendance policies required them to be at work at 8:00 a.m. and to inform

them that, "from this day forward," if an employee was one minute late they would

be disciplined.  (*See* Pl. Dep. at 170-71, 176-77; Heffelfinger Dep. at 204-05).  To

ensure compliance with the attendance policy, and to assist Heffelfinger in

monitoring attendance, Patti Munro, Vice President of Operations, instructed

Heffelfinger to have the employees e-mail Heffelfinger when they reported to work.

(*See* Pl. Dep. at 170-71, 174, 176-77; Heffelfinger Dep. at 186-87; Munro Dep. at 14).

    With the tardiness issue seemingly behind her, Plaintiff and Leto continued to

---

[7] Prior to the issue with punctuality, Plaintiff received a e-mails from Heffelfinger giving Plaintiff special recognition for achieving, and going beyond, her new member goal.  (*See* Doc. #31, Exhs. 14, 15).   In June 2007, Plaintiff received a "Highlight Award" from Heffelfinger for demonstrating extra effort above and beyond her expected job duties.  (*See* Doc. #31, Exh. 16).

experience some tension.  On September 25, 2007, Plaintiff sent Heffelfinger an e-mail complaining that Leto was excited when Plaintiff made an error.  Leto reportedly told a co-employee that she, Leto, was "so excited [about Plaintiff's error] she almost forgot to look for the OP#."  (Doc. #31, Exh. 5).  Heffelfinger responded to the e-mail: "Don't take it all personally . . . And Donna [Leto] did stand up to Susan Fitton and point out that it was not your error, it was Susan's.  Donna had your back in that situation.  I hope you acknowledged that to her."  (Doc. #31, Exh. 5).  But on the same date, September 25, 2007, Heffelfinger publicly complimented Plaintiff on exceeding her new member goal – "Victoria has not only hit her New Member goal for September but she has exceeded it by one!!!!!!!!  GREAT JOB" (*See* Doc. #31, Exh. 18).

The following day, September 26, 2007, Plaintiff arrived at work late, at 8:15 a.m.  (*See* Doc. #31, Exh. 2).  She emailed Heffelfinger at 9:22 that morning – "Sorry I'm late was caught in major traffic . . . I arrived about 8:15 but responded to a members request before I e-mailed I will notate on time card".  (*See* Doc. #31, Exh. 2; *see also* Pl. Dep. at 172-74 and Exh. 18 to Pl. Dep.).  Heffelfinger checked the branch surveillance cameras[8] and learned that not only did Plaintiff arrive late, but she left sixteen minutes early that same day.  (*See* Heffelfinger Decl. at ¶ 4).

---

[8] Heffelfinger did not preserve the camera footage.  (*See* Heffelfinger Dep. at 97).

Accordingly, Heffelfinger informed Plaintiff that she needed to record 7.5 hours worked on her time sheet for the day and to record the remaining .5 hour as personal time.  (*See* Heffelfinger Decl. at ¶ 4; *see also* Exh. D to Heffelfinger Decl.).  But instead of recording her time as instructed, Plaintiff recorded 7.75 hours worked for September 26, 2007.  (*See* Pl. Dep. at 179; *see also* Heffelfinger Decl. at ¶ 4 and Exh. D to Heffelfinger Decl.).  As a result, on October 2, 2007, Heffelfinger placed Plaintiff on a 60-day Performance Improvement and Monitoring Plan to correct the tardiness and time reporting errors.[9]  (*See* Pl. Dep. at 167-68; *see also* Doc. #31, Exh. 19; Heffelfinger Dep. at 182-83 and Heffelfinger Decl. at ¶ 4).  When Plaintiff asked Heffelfinger why she was being put on the Plan, Heffelfinger responded "Well, I reviewed the tape and, you know, you've been coming in at 8:07 or 8:05, or 8:03." (Pl. Dep. at 169).

Plaintiff believes that being placed on the Performance Improvement Plan was discriminatory because she was written up for being late while her co-worker Lauren

---

[9] The Performance Improvement and Monitoring Plan outlines "key elements" upon which Plaintiff was to focus: attendance and punctuality, and time keeping. (*See* Doc. #31, Exh. 19).  Time keeping is further explained: "If the employee does not meet the 8 hour work day requirements, that time not worked should be coded as personal time on the employee's timecard.  Should the employee's *personal* schedule or work . . . not permit them to extend their work day, ensuing them not to complete their full work day, personal time should be recorded for time not worked." (Doc. #31, Exh. 19).

Overton was not written up for similarly being late.[10]  (*See* Pl. Dep. at 144-145, 167-170, 177; *see also* Exhs. 8, 17 to Pl. Dep.).

**D.    Plaintiff's First EEOC Charge and Surrounding Claims of Discrimination**

On October 5, 2007, a few days after being placed on the Performance Improvement Plan, Plaintiff filed her first EEOC charge, number 420-2008-00057. (*See* Exh. 8 to Pl. Dep.).  The charge alleges disparate terms and conditions of employment, a racially hostile work environment as evidenced by "disparaging remarks about Black males," and retaliation.  (*See* Exh. 8 to Pl. Dep.).

Prior to filing the charge, Plaintiff had never complained of any race discrimination or harassment.  (*See* Pl. Dep. at 68).  She had, however, complained to Heffelfinger in August 2007 that Leto's attitude was hard to take at times, that Leto was blunt and abrupt and was not cordial in the mornings.[11]  (*See* Doc. #31, Exh. 4;

---

[10] There is some dispute in the record as to whether or not Overton arrived to work late after Heffelfinger informed the Birmingham Branch that there were no grace periods for late employees. What is undisputed is that Plaintiff was put on the Performance Improvement Plan for, *inter alia*, failing to accurately record her time.  No one suggests that Overton improperly recorded her time worked.  (*See* Heffelfinger Decl. at ¶ 5; *see also* Exh. E to Heffelfinger Decl.).

[11] Plaintiff testified that Leto would not wait on a lot of the members that came into the Credit Union.  (*See* Pl. Dep. at 55).  "I had a lot of members come to me, 'Well, I've been waiting, you know, ten minutes and she's [Leto's] just sitting there watching us and, you know, not responding to us.'" (*Id.*).  One member, Abigail, told Plaintiff that Leto was treating her differently because of her race.  (*See* Pl. Dep. at 211-12).  Plaintiff testified that she observed Leto fail to assist African American members of the Credit Union.  (*See* Pl. Dep. at 209).

One Credit Union member made a more formal complaint about Leto's behavior.  African American member Cassandra Patterson, said this: "I feel Donna Leto has a very nasty attitude toward

*see also* Heffelfinger Dep. at 52, 54-55).  But Plaintiff provided Heffelfinger with no specific examples of the alleged behavior of Leto.  (*See* Heffelfinger Dep. at 52-53).

The first EEOC charge also encompasses other complaints of discrimination. Although Plaintiff never reported any alleged inappropriate comments to anyone, she testified that prior to filing her first EEOC charge, Leto twice commented in reference to the Credit Union's members that "these people don't know how to balance their accounts."  (*See* Pl. Dep. at 56, 59-60, 66-68).  Plaintiff estimated by her own observation that 90 percent of the Credit Union members were black, and therefore Plaintiff believed that Leto was making a derogatory comment about African Americans.  (*See* Pl. Dep. at 56, 59-60, 66-68).  Plaintiff also claims that Leto once commented during Leto's break-up with her African American boyfriend that African American men "don't want to work to care for their families."  (Pl. Dep. at 64-66).

The questionnaire related to the first EEOC charge also makes reference to the perceived violation of Plaintiff's privacy rights.  (*See* Exh. 9 to Pl. Dep.).  Plaintiff claims that in 2007, when she applied for a personal loan for $1,500, Leto retaliated against her by seeking an unauthorized credit history for Plaintiff's husband as part

---

black people.  When I come into the bank I can sense an attitude that she has.  I don't know she have had a bad day or is she just like that all the time.  But she really don't know how to talk to black people or treat them."  (Def.'s Exh. 5 to Pl. Dep.).  Patterson made this formal written complaint after she complained to Plaintiff about the behavior and Plaintiff said, "[I]f you feel like you've got a legitimate complaint, let's write it down.  Let's get it in writing and I will pass it along to the supervisor, management or what have you."  (Pl. Dep. at 114).

of the loan transaction.  (*See* Pl. Dep. at 150-151).  This is despite the fact that the loan application itself indicates that Derrick Little, Plaintiff's spouse, was applying for the loan as a joint signer.  (*See* Exh. J to Heffelfinger Decl.).

### E.    Workplace Issues after the Filing of the First EEOC Charge

Plaintiff assumed that Heffelfinger would learn about the EEOC charge and would "reach out and try to repair things in Birmingham, but it didn't happen."[12]  (Pl. Dep. at 69-70).  Plaintiff and Leto continued to have a contentious work relationship. Leto reprimanded Plaintiff twice in October 2007.  (*See* Pl. Dep. at 208).  On October 29, Leto "tapped into [Plaintiff's] messages and re routed all . . . out going e-mails … when asked why I was being investigated, she simply told me to remember that she was my manager and she could tap my phone line and intercept e-mails when ever she wanted or needed to."[13]  (Doc. #31, Exh. 20).  On October 30, Plaintiff was written up by Leto "for wearing a [sic] ankle length skirt w/o stockings, but today she [Leto] chose to wear improper shoes or flip flops with the, thong between the toes clearly improper, nothing was said or done."  (Doc. #31, Exh. 20).  Additionally, Plaintiff

---

[12] Heffelfinger did understand, upon receipt of the EEOC charge sometime in October 2007, that Plaintiff was having issues with Leto.  (*See* Heffelfinger Dep. at 102-103).

[13] Plaintiff believes that her all of her e-mails, post the initial EEOC charge, were being forwarded to Leto, Heffelfinger, and Patti Munro.  (*See* Pl. Dep. at 208).  Plaintiff is not aware of another employee at the branch having their e-mails forwarded in such a fashion.  (*See* Pl. Dep. at 208-209).

claims that Leto made several comments, post the initial EEOC charge, that point to a racial animus:

- Plaintiff overheard Leto comment, in reference to a wedding, "this is not going to be a black and white wedding." (Pl. Dep. at 61, 63, 67). Plaintiff believes that this was an inappropriate comment, but admits that race was not discussed at all during the course of the conversation, and that the comment could have been a reference to the color scheme of the wedding. (*See* Pl. Dep. at 61, 63, 67).

- Plaintiff overheard Leto comment that she would never allow her daughter to marry a black man, but Leto's daughter is in fact married to a black man. (*See* Pl. Dep. at 84; *see also* Heffelfinger Decl. at ¶ 12).

- Leto asked Plaintiff if Plaintiff liked red beans and rice, and when Plaintiff said she did not, Leto allegedly commented "all black people eat red beans and rice," a comment Plaintiff claims is the equivalent of saying that African Americans like to eat "watermelon and fried chicken." (Pl. Dep. at 160, 162, 163).

- Heffelfinger requested that Plaintiff "smooth things over" with a Credit Union member who was upset. Plaintiff believes she was asked to take on that task because Leto "had a problem with African Americans." (Pl. Dep. at 124). Heffelfinger recalls receiving a complaint from a Credit Union member that Leto was blunt when communicating that a request for a loan had been denied, and does recall asking Plaintiff to telephone the member to allay any concerns.[14] (*See* Heffelfinger Dep. at 159-165). In

---

[14] In May of 2003, when Leto was working in Atlanta as a senior branch specialist, she was placed on probation and told to improve her attitude after she corrected her then-manager Allison Stanley, a white female, after Stanley told Leto that she was too abrupt with another employee. (*See* Munro Dep. at 127). The Action Plan for improvement included "no yawning, slouching over, rolling your eyes, making disgruntled faces, and other negative behaviors not effective or positive leadership." (Doc. #31, Exh. 13). Leto satisfied the terms of a probationary period and was not

fact, Plaintiff had given "a lot of the members" Heffelfinger's "direct dial number so that they would talk with her." (Pl. Dep. at 123).

The issues with the working relationship between Plaintiff and Leto escalated to culmination in November 2007.

### F.    Plaintiff's November 2007 E-mail Complaint

In November 2007,  Plaintiff asked Leto a question about balancing the ATM, which had "gotten stuck." (Pl. Dep. at 81).  Leto reportedly was "very angry" and said "stupid" under her breath, in the presence of Plaintiff and Lauren Overton. (*See* Pl. Dep. at 13-33, 81; *see also* Doc. #31, Exh. 8).  "[S]he began saying things like this is not good, ridiculous and other things under her breath such as stupid and she began shaking her head back and forth as if in disbelief that I asked for her help in any way, after locating the problem with the ATM she turned to me in a very aggressive manner and told me I was to have the ATM up in 5 minutes or else." (Doc. #31, Exh. 8).

Plaintiff, feeling that "tensions were high," sent an email to Patti Munro, Vice President of Operations, Heffelfinger, and several other high level members of Credit Union management,[15] in which she complained that Leto had become "verbally

disciplined thereafter.  (*See* Leto Dep. at 85, 161-62).

[15] The e-mail indicates that Plaintiff "broke the chain of command" by e-mailing other high level members Credit Union management, in addition to Heffelfinger, because "my manager

abusive" towards her when she asked for Leto's help, and that she "didn't appreciate being talked to that way or treated that way." (*See* Doc. #31, Exh. 8; *see also* Pl. Dep. at 81). The e-mail did not contain a complaint about any alleged racially discriminatory treatment, did not mention the word race, and the Credit Union did not consider the complaint to be one addressing race discrimination. (*See* Pl. Dep. at 134-35 and Exh. 6 to Pl. Dep; *see also* Lyons Dep. at 132-34; Munro Dep. at 36, 39).

Munro, understanding that the e-mail complained of verbal abuse from Leto, did not take it upon herself to investigate the complaints made therein because Munro was not Leto's supervisor. (*See* Munro Dep. at 110). Although Heffelfinger did report to Munro, and the e-mail did contain a contention that Heffelfinger had not addressed previous complaints, Munro did not investigate the complaint against Heffelfinger. (*See* Munro Dep. at 110-111, 118). Instead, Munro recommended that the entire e-mail be sent to David Lyons in Human Resources. (*See* Munro Dep. at 118-120).

Upon receipt of the email, Vice President of Human Resources and Training David Lyons discussed the e-mail with Plaintiff. (*See* Lyons Dep. at 266-67; *see also* Pl. Dep. at 137, 213). According to Plaintiff, Lyons seemed defensive, disinterested,

---

[Heffelfinger] has known of the situation for some time now and a lot of the issued [sic] mention within the email have not been resolved or even addressed by her." (Doc. #31, Exh. 8).

and dismissive when talking with her about the e-mail and Plaintiff's belief that Leto

was being discriminatory toward Plaintiff and the Credit Union members.[16]  (*See* Pl.

Dep. at 137-39).  Plaintiff never heard from Lyons again.  (*See* Pl. Dep. at 137, 213).

### G.   Incidents Leading up to the Termination of Plaintiff's Employment with the Credit Union

On December 2, 2007, Plaintiff completed the sixty day Performance

Improvement Plan she had been placed on to address her tardiness and time reporting

---

[16]

| Q: | And what was David's response to your concerns when you had this conversation with him? |
| A: | He was very defensive.  He seemed as though – seemed to think that I was making a lot of this – a lot of this was in my head.  You know, the only thing I could tell him was the truth and, you know, I guess he made his decision or whatever. |

| Q: | And when you say, "made his decision," what do you mean? |
| A: | Well, actually, after that day, I never heard from him again. |

| Q: | What comments did he make that made you think he was being very defensive? |
| A: | Say, for instance if I, you know, told him that some of the members have complained about being racially discriminated or, you know, I feel that I'm being retaliated against because I filed the EEOC claim, he would say, "Oh, really?" but never say that, "Okay.  Well, I will address that.  You know, who are the people?  Give me the names and, you know, we're going to make it right," or what have you.  He never said anything like that. |

| Q: | Okay.  So in the conversation that you had with David, did you tell him that you thought you were being retaliated against? |
| A: | Yes. |

| Q: | Because you had filed the EEOC charge? |
| A: | Correct. |

(Pl. Dep. at 136-138).

problems.[17]   (*See* Pl. Dep. at 177, 180; *see also* Heffelfinger Decl. at ¶ 6).   At her

annual performance review, Plaintiff received a salary increase and received an

overall rating of "often meets standards and goals."   (*See* Pl. Dep. at 189; *see also*

Heffelfinger Dep. at 97, 229; Heffelfinger Decl. at ¶ 6 and Exh. F to Heffelfinger

Decl.).   However, Plaintiff was found to be lacking in loan knowledge, a skill

expected of MSRs with her level of experience.   (*See* Heffelfinger Decl. at ¶ 6).

During the course of the performance review, Heffelfinger reminded Plaintiff that

transaction errors must be kept at two or less per month.   (*See* Pl. Dep. at 189; *see*

*also* Heffelfinger Dep. at 97, 229; Heffelfinger Decl. at ¶ 6 and Exh. F to Heffelfinger

Decl.).

On December 4, 2007, Plaintiff received an e-mail from Heffelfinger in which

Heffelfinger praised Plaintiff for waiting on approximately half of all of the members

that signed into the Birmingham branch of the Credit Union.[18]   (*See* Pl. Dep. at 210-

211; *see also* Doc. #31, Exh. 1).   However, in the three-week period following

---

[17] Heffelfinger testified that because the issues necessitating the Performance Improvement Plan were resolved, attendance and punctuality problems prior to October 2007 were not considered in making the recommendation to terminate Plaintiff's employment in January 2008.   (*See* Heffelfinger Dep. at 187).

[18] According to Plaintiff, she, Leto, and Overton should have waited on the same number of Credit Union members each month.   However, Overton waited on more members than Plaintiff the previous month and Leto's primary job was not to wait on members.   (*See* Pl. Dep. at 211; *see also* Heffelfinger Dep. at 137-138, 171; Heffelfinger Decl. at ¶ 11).

completion of her Performance Improvement Plan, Plaintiff made six transaction errors, equaling more than two errors per week.[19]  (*See* Heffelfinger Decl. at ¶ 7).  As a result, Plaintiff received a Written Warning for her errors, which warning alleged errors dating from December 5, 2007 through December 28, 2007.  (*See* Pl. Dep. at 216-17 and Pl. Exh. 3 to Pl. Dep.; *see also* Heffelfinger Decl. at ¶ 7 and Exh. G to Heffelfinger Decl.).  Plaintiff typed up a response to the December 31, 2007 Written Warning and submitted it to Heffelfinger.[20]  (*See* Pl. Dep. at 216-17; *see also* Doc. #30, Exhs. 10, 11).  The errors and responses thereto were these:

> (1)  On December 5, 2007, Plaintiff failed to confirm a member's address prior to mailing a debit card pin reminder.  As a result, the pin number was sent to the wrong address.  (*See* Heffelfinger Decl. at ¶ 7; *see also* Exh. G to Heffelfinger Decl.).
>
> Plaintiff responds that the member asked for the pin information to go to a certain address.  (*See* Pl.'s Exh. 3 to Pl. Dep.).
>
> (2)  Plaintiff failed to properly complete the Cash Balance Sheet for December 7, 2007, which caused the entire Credit Union to fail to balance properly for the day.  (*See*

---

[19] Plaintiff was made aware of these errors throughout the month of December during the time she was incurring them, as was Heffelfinger.  (*See* Heffelfinger Decl. at ¶ 7; Heffelfinger Dep. at 238-39).  However, no one sat down with Plaintiff and counseled her as to the errors as she was incurring them.  (*See* Heffelfinger Dep. at 237).  Plaintiff did not receive a formal Written Warning until the number of errors hit seven.  (*See* Heffelfinger Dep. at 238).

[20] Heffelfinger never met with Plaintiff in person to discuss the Written Warning.  (*See* Pl. Dep. at 182).

Heffelfinger Decl. at ¶ 7; *see also* Exh. G to Heffelfinger Decl.).

Plaintiff responds that the overage error was first made by Lauren Overton.  Overton recorded the overage error on the Branch Cash Balance Sheet.  (*See* Pl.'s Exh. 3 to Pl. Dep.).

Plaintiff also alleges that the ATM was out of balance, but that Overton was responsible and the custodian for the ATM at the time that error was made, while Plaintiff was responsible for the vault.  (Heffelfinger Dep. at 252).  When the cash machine was over $1.00, this caused the vault to be short $1.00.  (*See* Doc. #30, Exh. 12).

Overton was not reprimanded for the incident.  (*See* Heffelfinger Dep. at 252, 255-56).

(3)     Plaintiff closed a dormant account without the input of another employee on or about December 10, 2007.  Because dormant accounts are frequently involved in employee theft, two employees must be involved in dormant account transactions.  (*See* Heffelfinger Decl. at ¶ 7; *see also* Exh. G to Heffelfinger Decl.).

(4)     On December 10, 2007, Plaintiff failed to verify an ATM deposit resulting in an improper hold of the member's funds, about which the member contacted Credit Union headquarters to complain.  (*See* Heffelfinger Decl. at ¶ 7; *see also* Exh. G to Heffelfinger Decl.).

Plaintiff alleges that she was told that cash was never held, and therefore had no reason to check to see if any cash deposit had been held.  (*See* Doc. #30, Exh. 11).

(5)     On December 20, 2007, Plaintiff improperly linked two member accounts together, providing each member with

23

full access to funds and financial information for both accounts. One of the members reported the error to the Credit Union, demanding proof that the accounts had been separated. (*See* Heffelfinger Decl. at ¶ 7; *see also* Exh. G to Heffelfinger Decl.).

Plaintiff testified that she asked Leto how to give a member a new member referral, and that she was instructed to link the two accounts as a non joint family member account. (*See* Doc. #31, Exh. 11).

(6)   On December 28, 2007, Plaintiff failed to follow instructions given to her by another department regarding the processing of a Canadian check. (*See* Heffelfinger Decl. at ¶ 7; *see also* Exh. G to Heffelfinger Decl.).

(7)   On December 26, 2007, Plaintiff failed to follow Credit Union timekeeping policies and failed to accurately record her time worked. (*See* Heffelfinger Decl. at ¶ 7; *see also* Exh. G to Heffelfinger Decl.).

Plaintiff responds that although she was told to complete her time sheet by Monday, December 24, 2007, the branch was closed that day. (*See* Doc. #30, Exh. 11).

Plaintiff did not sign the Written Warning to acknowledge that she received it, nor did anyone notate on the document that Plaintiff refused to sign it. (*See* Munro Dep. at 200-201). However, Plaintiff readily admits that she received the Warning. (*See* Pl. Dep. at 216). She believes that it was discriminatory because "[n]o one else in the branch was issued any Written Warnings, and by me being the only African-American there and filing an EEOC charge, I do definitely believe it was issued

because of [race]." (Pl. Dep. at 183).  Plaintiff also believes that the Written Warning

was "ridiculous" and retaliatory because it was received after the EEOC charge was

filed and that the Credit Union was trying to find a way to get rid of her.  (*See* Pl.

Dep. at 185).  She denies that she should be responsible for the majority of errors set

forth in the Warning.  (*See* Pl. Dep. at 181-82).

Just days after she received the Written Warning for transaction errors, both the

IT and accounting departments reported to Heffelfinger that Plaintiff had failed to

"bank" the Birmingham branch.  (*See* Heffelfinger Dep. at 128-129).  Failing to bank

the branch is a serious error and entails a failure to close the books for the day, which

is disruptive both to the accounting system for the Birmingham Branch, and for the

Credit Union as a whole.  (*See* Heffelfinger Dep. at 128-29).  When initially

confronted about the situation, Plaintiff denied responsibility for the error.[21]  (*See*

Heffelfinger Dep. at 129-30, 134).  However, after the IT and accounting departments

confirmed that it was in fact Plaintiff's error, Heffelfinger communicated that fact to

---

[21] Heffelfinger testified:

> A:    I contacted Victoria to ask her, because she was the custodian or she
>       was in charge of that activity.  She said that she did it, and once the
>       paperwork arrived in Florida in the overnight bag, that it would prove
>       that she was . . . right.  Well, the paperwork arrived in Florida and …
>       Victoria was wrong.  She still denied to me that – you know, she did
>       it, she did it.

(Heffelfinger Dep. at 129).

Plaintiff[22] and Plaintiff responded in an instant message:

> well congratulations, this must make you very excited and proud
> Just another error you can add to the arsenal!!! of things Victoria
> is doing wrong, hey I bet none of the other tellers have ever
> forgotten to bank the branch just me and yes I have done it since
> Nov01, w/o error so what an I only 98% NOT PERFECT I must
> be only human what a shame.

(Heffelfinger Dep. at 130, 134 and Exh. 18 to Heffelfinger Dep.; *see also* Heffelfinger

Decl. at ¶ 8 and Exh. H to Heffelfinger Decl.).

Upon receiving the instant message from Plaintiff, Heffelfinger called David

Lyons and said "I'm not really sure how to manage this.  I've never been spoken to

like this from an employee." (Heffelfinger Dep. at 130).  Heffelfinger sent the instant

message to Lyons, and Lyons, on Heffelfinger's recommendation, told Heffelfinger

"it was okay to go ahead and terminate her, based on that activity, all of those

activities, the banking and the instant message." (Heffelfinger Dep. at 127-134, 141-

142, 357-359; *see also* Exh. 18 to Heffelfinger Dep.).  Munro concurred in the

---

[22] Heffelfinger testified:

> A:    IT – I called IT and said Victoria says that she did it.  IT said, no, we
> had to go in and manually do this.  So they had to account for the
> money and everything being remotely and not in charge of money.
> They faxed me all the paperwork to prove that they had to physically
> go in and do Victoria's job.  So I IM'd her and said, "Well, actually,
> you didn't do it.  I've got the paperwork from IT, and I've got your
> overnight bag that you said was going to prove that you did it, and it's
> wrong."

(Heffelfinger Dep. at 129-130).

decision[23] and Heffelfinger and Munro communicated the decision to Plaintiff on

January 10, 2008.[24]   (*See* Pl. Dep. at 93, 196-97; *see also* Heffelfinger Dep. at 140-

---

[23] Munro testified that she believed that Heffelfinger was not retaliating against Plaintiff by terminating Plaintiff's employment because Plaintiff made seven errors "in a very short period of time." (Munro Dep. at 196-198).  When asked to name "each and every reason" why Plaintiff's employment was terminated, Munro said: "she wasn't keeping accurate time," (Munro Dep. at 213), "she was making repeated mistakes," (Munro Dep. at 219-220), and "not banking the branch" (Munro Dep. at 220).  But the decision to terminate Plaintiff's employment was Heffelfinger's, Munro just agreed with it.  (Munro Dep. at 226).

[24] Although Plaintiff brings to light the fact that the Credit Union has a progressive discipline policy which requires an employee to be coached and counseled and given a written warning prior to termination, the record is undisputed that the progressive discipline policy did not apply to Plaintiff because of the nature of her errors.

> Q:   And what did you tell Ms. Little in this meeting?
> A:   The reasons why she was being terminated.
>
> Q:   What did you tell her?
> A:   That she was insubordinate, that she had a number of serious errors, and that she was inappropriate to members – not members – to myself.
>
> Q:   And you told her that she was being terminated for insubordination; is that correct?
> A:   Yes.
>
> Q:   Did you follow the progressive discipline policy when you made the recommendation that Victoria Little be fired?
> A:   No, because she was – once it's in the conditions of employment, that's outside the realm of – that like trumps the progressive policy, because conditions of employment is considered like a deal breaker.
>
> Q:   What do you mean by conditions of employment?
> A:   Like being drunk at work, being insubordinate, stealing money.  There's no progressive policy for those.
>
> Q:   So you equate what she put in the IM equal to being drunk or stealing money?
> A:   I don't.  The handbook does.

141, 147-48; Lyons Dep. at 228-29).  Plaintiff was told that she was being terminated

for sending an e-mail to Heffelfinger in which Plaintiff "screamed" at Heffelfinger.[25]

(*See* Pl. Dep. at 93-94).

Plaintiff testified that she believes her termination was related to her race

because Heffelfinger and Leto were "very close, so I just felt that because of my race,

I was terminated because they didn't want to deal with the issues of the EEOC claims

or the issues of Donna [Leto], period."  (Pl. Dep. at 86).  Plaintiff believes that Leto

and Heffelfinger are close because "they would do a lot of laughing and the

comradery.  I just assumed they were friends."  (Pl. Dep. at 87).    Plaintiff also

believes that her termination was in retaliation for her complaints because at one

point she had received a "Presidential Award" for exemplary employment.  (*See* Pl.

Dep. at 84-85, 90).

---

(Heffelfinger Dep. at 148-149).

[25]  Plaintiff testified:

Q:    Did you have any idea what Ms. Heffelfinger was referencing when she said
      that you had sent an e-mail screaming at her?
A:    I sent an e-mail to human resources and I capitalized the first letter, and
      maybe I capitalized the second word, the second letter; I don't know.  I
      wasn't paying attention to my typing.  But the original e-mail was not sent to
      Ms. Heffelfinger.  It was sent to human resources confidentially, and then
      human resources sent it to Ms. Heffelfinger.  And she mentioned that no one
      ever screamed at her or something like that.

(Pl. Dep. at 94-95).

### H.    Plaintiff's Second EEOC Charge and Surrounding Claims of Discrimination

On January 11, 2008, Plaintiff filed her second EEOC charge, number 420-2008-00894, alleging race discrimination and retaliation in the termination of her employment with the Credit Union.  (*See* Pl. Dep. at 152 and Exh. 10 to Pl. Dep.). The EEOC dismissed Plaintiff's first EEOC charge in March 2008 and issued a Notice of Right to Sue based on Plaintiff's attorney's request as to her second EEOC charge in December of 2008.  (*See* Pl. Dep. at 166-67; *see also* Heffelfinger Decl. at ¶ 9 and Exh. I to Heffelfinger Decl.).  Plaintiff filed her first lawsuit against the Credit Union on June 17, 2008, which suit alleged race discrimination, retaliation, and a racially hostile work environment.  (*See* Pl. Dep. at 155-58 and Exhs. 13, 14 to Pl. Dep.).  She filed her second lawsuit against the Credit Union on March 9, 2009, and the two cases were consolidated by agreement of the parties.  (*See* Pl. Dep. at 155-58 and Exhs. 13, 14 to Pl. Dep.; *see also* Doc. #16).

### IV.    <u>Applicable Substantive Law and Discussion</u>

### A.    Hostile Work Environment in the form of Racial Harassment under Title VII and 42 U.S.C. § 1981[26]

In order to establish a *prima facie* case of hostile environment in the form of

---

[26]  The Eleventh Circuit applies the same analytical framework to Title VII and § 1981 race discrimination claims.  *See Cooper v. Southern Co.*, 390 F.3d 695, 724-25 (11th Cir. 2004).

racial harassment, Plaintiff Little must demonstrate: (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on her race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a racially abusive work environment; and (5) a basis for holding the employer liable. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc). Such showing arises only where the racial harassment is so "severe or pervasive" as to "alter the conditions of employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (citation omitted). The standard is "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788 (citation omitted). For example, offhand comments, isolated incidents (unless extremely serious), and other similar tribulations of the workplace will not amount to changes altering the terms and conditions of employment. *Faragher*, 524 U.S. at 788. Furthermore, in order to be actionable under the statute, the work environment must be offensive on both an objective[27] and

---

[27] The objective evaluation is based on a "reasonable person" standard. *Watkins v. Borden*, 105 F.3d 1344, 1355-56 (11th Cir. 1997) (affirming the use of the "reasonable person" standard in a hostile work environment claim where the plaintiff argued that the court should have applied a more contextual standard such as "a reasonable African-American person.")

a subjective level. That is, the environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787. This is a question to be determined with regard to the totality of the circumstances. *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir. 1982).

The Eleventh Circuit has specified the following factors to consider in determining whether an environment is hostile: (1) the frequency of the discriminatory conduct, (2) the severity of the discriminatory conduct, (3) whether the conduct is threatening or humiliating or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the plaintiff's performance at work. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521-22 (11th Cir. 1995). The undisputed facts in this case indicate that the work atmosphere was neither "charged with racial hostility" nor abusive. *Edwards*, 49 F.3d at 1521. The Supreme Court has repeatedly emphasized that this cause of action is limited to extreme work conditions. *See, e.g., Faragher*, 524 U.S. at 788; *Oncale*, 523 U.S. at 81.

The alleged harassment of Plaintiff comes from isolated comments made by Leto which, fairly read, are not necessarily racially charged:[28] (1) in reference to

---

[28] Plaintiff's brief in opposition to the motion for summary judgment does not specifically delineate those comments and actions of Leto which Plaintiff contends were racially hostile. Instead, the brief summarily states: "The record is replete with circumstantial evidence from which the

31

Credit Union members, Leto stated "these people don't know how to balance their accounts;" (2) Leto stated, after she broke up with her own African American boyfriend, that African American men "don't want to work to care for their families;" (3) in discussing a wedding, Leto commented, "this is not going to be a black and white wedding;" (4) Leto commented that she would not allow her daughter to marry a black man; and (5) Leto stated that "all black people eat red beans and rice." (*See* Pl. Dep. at 56, 59-61, 63-67, 84, 160, 162, 163). The first and third comments cannot even be considered in support of Plaintiff's hostile environment claim. Because Title VII does not regulate the "general civility" of employees, *see Faragher*, 524 U.S. at 788, conduct that may be counted as contributing to a hostile environment *must be of a race-related nature* and not "[i]nnocuous statements or conduct" that bear no relation to race, *see Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000).

That leaves three comments, made over the course of fifteen months of employment, that could possibly be considered racially charged. And of course, those comments are not so "overt and denigrating and [] pervasive and shocking" to create

---

factfinder can infer Ms. Leto harbored and acted on racial bias. Ms. Leto repeatedly made racial offensive comments and refused to assist the African American members." (Doc. #30 at 69). As a result, the court was left to shore up all of the comments and conduct that could possibly have been construed by Plaintiff as racially discriminatory.

an atmosphere charged with racial hostility.  *EEOC v. Beverage Canners, Inc.*, 897

F.2d 1067, 1070 (11th Cir. 1990).  Further, while Plaintiff testified that she did not

like working with Leto "because she made several racist comments" (Pl. Dep. at 83),

Little attempts to make no claim that her work product was affected by Leto's

comments.  (*See* Doc. #30 at 68-69).  On these facts, the record does not demonstrate

that Plaintiff was exposed to sufficiently egregious conduct to support a hostile

environment claim.[29]  Instead, the record demonstrates, at best, that Little was forced

---

[29] Plaintiff's brief in opposition to the motion for summary judgment mentions, without explaining, that Leto's "refusal" to assist African American members of the Credit Union is evidence of a racially charged hostile work environment.  (*See* Doc. #30 at 69-70) ("Ms. Leto . . . refused to assist the African American members" and "[a]t issue is whether Defendant took any action when Plaintiff and the African American members complained about Ms. Leto's racist conduct.").  While the record does contain complaints from Credit Union members that Leto would not assist them, the record is also undisputed that it was not Leto's primary job to wait on members that came into the Birmingham Branch.  (*See* Pl. Dep. at 211; *see also* Heffelfinger Dep. at 137-138, 171; Heffelfinger Decl. at ¶ 11).  The one written complaint from a black member complaining of racial discrimination similarly cannot support Plaintiff's claim for a racially hostile work environment because it is a single complaint received approximately two weeks before Plaintiff's employment was terminated, and was not brought to the attention of anyone in higher management at the Credit Union.  (*See* Pl. Dep. at 115; *see also* Doc. #30 at 70).

The court reminds counsel for Plaintiff that "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."  *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990) ("Appellant suggests that where a party includes information in declarations or affidavits related to a summary judgment motion which might form the basis of an argument or defense, but the party fails to articulate such an argument, the district court may nevertheless be required to consider the argument based on Rule 15(b) and can be reversed on appeal for failing to do so. Taking appellant's contention to its logical conclusion would render the summary judgment process an exercise in futility, and would place the onus on the district court to distill any possible argument which could be made based on the materials before the court. Presenting such arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court, and Rule 15(b) provides no basis for this court to consider appellant's change of circumstances argument for the first time on appeal.").

to bear the tribulations of an ornery supervisor.  *See Faragher*, 524 U.S. at 788.

Summary judgment is appropriate because Plaintiff's allegations fall below the

*Mendoza* line.  *Mendoza*, 195 F.3d at 1247-48.

### B.   Racial Discrimination in the form of Disparate Treatment under Title VII and 42 U.S.C. § 1981[30]

Although Plaintiff's complaint makes a claim for racial discrimination in the

form of disparate treatment, her brief in opposition to summary judgment wholly fails

to argue that those claims should survive summary judgment.  (*See* Doc. #30 at 67-

76).  Instead, Plaintiff's brief focuses *only* on her hostile work environment and

retaliation claims.  (*See, e.g.,* Doc. #30 at 76) ("Plaintiff has proven her *prima facie*

case for all of her claims and rebutted Defendant's alleged non-discriminatory reasons

for her sexual [sic?] harassment and, ultimately, her retaliatory termination.").  The

court will not wield Plaintiff's burden for her by launching a sua sponte investigation

into whether any possible bases exist to defeat summary judgment on disparate

treatment claims, or whether any facts in the extensive laundry list set forth by

Plaintiff could support a disparate treatment claim. *See, e.g., Van Portfliet v. H&R*

*Block Mortg. Corp.*, 290 Fed. Appx. 301, 304 (11th Cir. Aug. 21, 2008) ("Plaintiff

---

[30] Note once again that the Eleventh Circuit applies the same analytical framework to Title VII and § 1981 race discrimination claims. *See Cooper v. Southern Co.*, 390 F.3d 695, 724-25 (11th Cir. 2004).

makes passing reference to his claim that his report of racial harassment constituted protected expression; he offers no argument or citations of authority on this claim. Under our practice, we treat this claim as abandoned."); *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir.2000) (party's failure to brief and argue issue before district court is ground for declaring it abandoned); *McMaster v. United States*, 177 F.3d 936, 940-41 (11th Cir.1999) (noting that a claim may be considered abandoned when it is included in complaint, but plaintiff fails to argue it to district court); *Lyes v. City of Riviera Beach, Fla.*, 126 F.3d 1380, 1388 (11th Cir. 1997) (explaining that "the onus is on the parties to formulate arguments" in Rule 56 proceedings); *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 182 F.3d 888, 892 (Fed. Cir.1999) (discussing "unremarkable proposition that assertions made in the pleadings ..., but not made in opposition to a motion for summary judgment, need not be considered by the district court or the appellate court in ruling on the motion"); *Laborers' Int'l Union of North America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir.1999) ("We have long refused to consider arguments that were not presented to the district court in response to summary judgment motions.").

And, even assuming, *arguendo*, that Plaintiff had not abandoned her disparate treatment claims, they would nevertheless fail.  With no direct evidence of racial

discrimination, the circumstantial case would follow the framework set forth in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of*

*Community Affairs v. Burdine*, 450 U.S. 248 (1981).[31]  Plaintiff's testimony reveals

---

[31] Under the *McDonnell Douglas* and *Burdine* framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. *See id.* at 1527-28. The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation. *See, e.g., Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984); *Lincoln v. Board of Regents of Univ. Sys.*, 697 F.2d 928, 937 (11th Cir. 1983).  In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly *McDonnell Douglas*, 411 U.S. at 802 (hiring); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); *see also Nix*, 738 F.2d at 1185 (discipline); *Pittman v. Hattiesburg Mun. Separate Sch. Dist.*, 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Combs*, 106 F.3d at 1528.  The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine,* 450 U.S. at 254-55; *see Chapman*, 229 F.3d at 1024.  If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination is dispersed and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination. When the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons. *Chapman*, 229 F.3d at 1024-25.  Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case. *Combs*, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the *McDonnell Douglas* and *Burdine* framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.  Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may defeat a summary judgment by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination. *Reeves v. Sanderson Plumbing Prods. Inc.*, 120 S. Ct. 2097, 2108-09 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value

that she believes she was subjected to disparate treatment on the basis of her race on two occasions; first, when she was placed on the Performance Improvement Plan in October 2007, and second, when she received a Written Warning in December 2007. But for each of these events, Plaintiff fails to present a comparator similarly situated "in all relevant respects," fails to establish that she did not violate the work rules, and fails to establish that she has any other evidence of discrimination.[32]  *See Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1310 (11th Cir. 1998); *see also Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989) (holding that in order to show discriminatory discipline, plaintiff must show either that he did not violate the work rule or "that he engaged in misconduct *similar* to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against other persons who engaged in *similar*

---

of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating a Rule 50 motion); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993); *Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir. 2000); *Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000); *Combs*, 106 F.3d at 1529-38 (interpreting *Hicks* and the post-*Hicks* case law); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 920-21 (11th Cir. 1993).

[32] As to the Performance Improvement Plan, Plaintiff was subjected to the Plan because she was not simply tardy but failed to properly record her time.  (*See* Heffelfinger Decl. at ¶ 4).  This is in contrast to potential comparator Lauren Overton, who immediately informed her manager that she was late and properly recorded her time.  (*See* Heffelfinger Decl. at ¶ 5).  And as to the Written Warning, although Plaintiff makes excuses for the delineated mistakes, she does not deny that the mistakes were in fact made.  (*See* Doc. #31, Exhs. 10, 11).  Further, Plaintiff has no potential comparator who similarly made seven transaction errors in one month.

misconduct") (emphases added); *Wilson*, 376 F.3d 1079, 1092 (11th Cir. 2004) ("If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.").

For the foregoing reasons, summary judgment is appropriate as to Plaintiff's disparate treatment claims.

### C.    Retaliation under Title VII and 42 U.S.C. § 1981[33]

Title VII and § 1981 prohibit an employer from discriminating against any individual for participation in or opposition to unlawful employment practices. *See* 42 U.S.C. § 2000e-3(a); 42 U.S.C. § 1981. Title VII's anti-retaliation provision prohibits an employer from retaliating against an employee "because [she] has opposed any practice made an unlawful employment practice" by Title VII, including discrimination on the basis of race. 42 U.S.C. § 2000e-3(a). The goal of this provision is "prevent[ ] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees," including freedom from race discrimination. *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2412, 165 L.Ed.2d 345 (2006).

---

[33] The Eleventh Circuit applies the *McDonnell Douglas* framework when analyzing claims of retaliation brought under both Title VII and § 1981. *See Baker v. Russell Corp.*, Slip Copy, 2010 WL 1434404, No. 09-14930 at *2 (11th Cir. April 12, 2010) (citing *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009), *cert. denied*, – S. Ct. – (U.S. Feb. 22, 2010)).

Retaliation is a separate offense under both statutes. *Meeks v. Computer Assocs.*, 15 F.3d 1013, 1021 (11th Cir.1994) (citing 42 U.S.C. § 2000e-3(a)). "An employee need not prove the underlying claim of discrimination for the retaliation claim to succeed." *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir.1999) (citations omitted).

To establish a *prima facie* case of retaliation, Plaintiff must show: (1) that she engaged in protected activity or expression; (2) that she suffered an adverse employment action; and (3) that the adverse employment action was causally connected to the protected conduct. *See Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998); *see also Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989). If Plaintiff is able to advance a *prima facie* case of retaliation, the burden then shifts in accordance with *McDonnell Douglas* to the Credit Union to articulate legitimate, non-discriminatory reasons for the alleged retaliatory acts. *See Phillips v. Aaron Rents, Inc.*, 262 Fed. Appx. 202, 210 (11th Cir. Jan. 11, 2008) ("Retaliation claims are also analyzed under the *McDonnell Douglas* burden-shifting framework.") (citing *Holifield*, 115 F.3d at 1566). Upon articulation, Plaintiff must demonstrate that the Credit Union's proffered explanation is a pretext for retaliation in order for her claim to survive summary judgment. *See id.* That is, the plaintiff must then "demonstrate that [she]

39

will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (citation and internal quotation omitted).

### 1.   The Prima Facie Case

#### a.   Statutorily Protected Expression

Plaintiff's brief in opposition to the motion for summary judgment fails to delineate which of her actions purportedly constitute statutorily protected expression. She says only that she "complained verbally and in writing, regarding the harassment by Ms. Leto," specifically mentioning only the charge of discrimination she filed with the EEOC on October 5, 2007, and the e-mail she sent to upper level management on November 5, 2007 which complained about the actions (or inactions, as the case may be) of Leto and Heffelfinger.  (Doc. #30 at 72).  These specific acts mentioned are the ones the court will consider as possible protected expression.

Clearly, Plaintiff engaged in protected expression when she filed a charge of discrimination with the EEOC on October 5, 2007.  But the less formal e-mail complaint may be considered protected activity only if the Little can show that she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices," *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir.

2002), and if her complaint was one of unlawful discrimination.  *Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989).  Not every complaint about conditions in the workplace, legitimate or otherwise, constitutes protected activity; retaliation in response to an activity that is not protected does not support a retaliation claim.  Here, the November 2007 e-mail fails to disclose that Little's complaint was grounded in racial harassment, instead setting out "abusive" behavior of a supervisor who had lost patience with Little.[34]  (*See* Doc. #31, Exh. 8).  Therefore, it cannot satisfy the protected expression element of the retaliation prima facie case.[35]  *See Van Portfliet v. H&R Block Mortg. Corp.*, 290 Fed. Appx. 301, 304 (11th Cir. Aug. 21, 2008) ("[B]ecause reporting the undisclosed racial slur failed to satisfy the statutorily protected expression requirement, that expression can support no retaliation claim as a matter of law."); *see also Pipkins v. City of Temple Terrace,*

---

[34] Even assuming, *arguendo*, that the e-mail was statutorily protected expression, Plaintiff's retaliation claim based on that e-mail would nevertheless fail because Plaintiff has failed to show that her belief of racial harassment was objectively reasonable.  *See Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999).  *See* discussion *infra* Section IV.A. (finding that Plaintiff failed to establish a prima facie case of a racially hostile work environment).

[35] The court can foresee an argument, one not made by Plaintiff, that because Plaintiff had filed a racially based charge of discrimination with the EEOC *prior to* the time she sent out the e-mail complaint, the Credit Union should have known that the e-mail was complaining about racial discrimination.  But the employer cannot be asked to infer that discrimination occurred.  *See Demers v. Adams Homes of Northwest Fla., Inc.*, 321 Fed. Appx. 847, 852 (11th Cir. 2009) (To engage in protected activity, the employee must, "at the very least," communicate her belief that discrimination is occurring to the employer and cannot rely on the employer to "infer that discrimination has occurred.").  Moreover, because Plaintiff has not made such an argument, the court need not consider it here.

*Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001) ("Statutorily protected expression includes internal complaints of sexual harassment to superiors as well as complaints lodged with the EEOC . . ."); *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1075 (11th Cir. 1995) ("Unfair treatment, absent discrimination based on race, sex, or national origin, is *not* an unlawful employment practice under Title VII."); *Wehunt v. R.W. Page Corp.*, 352 F.Supp.2d 1342, 1358 (M.D. Ga. 2004) ("At a minimum, an employee must communicate to her employer her belief that discrimination was occurring.  It is not enough to simply complain in a racially neutral way about an employer's practices, and then expect the employer to speculate as to whether such complaints may be motivated by an employee's subjective and undisclosed belief that the employer was engaged in race discrimination.").

### b.     Adverse Employment Action

Because Plaintiff engaged in statutorily protected expression when she filed a charge of discrimination with the EEOC on October 5, 2007, the adversity piece of the *prima facie* case requires consideration.  The problem with the analysis is that other than the termination of employment itself, Plaintiff has left the court to guess which actions of the Credit Union she believes were adverse.  (*See* Doc. #30 at 73) ("Plaintiff relies on the recent case of *Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008), regarding the adverse actions she was forced to endure before her employment

ended in the ultimate adverse employment action, termination."). Presumably the Written Warning and performance evaluation she received could be considered adverse actions.[36]

The Supreme Court has provided some guidance on the level of materiality required for a plaintiff to establish the second element of the retaliation *prima facie* case. In *Burlington Northern & Santa Fe R.R. Co. v. White*, the Supreme Court concluded that "the provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant. In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." 548 U.S. 53 (2006); *see also Bush v. Regis Corp.*, 257 Fed. Appx. 219, 222 (11th Cir. Dec. 3, 2007); *Taylor v. Roche*, 196 Fed. Appx. 799, 802 (11th Cir. Sept. 12, 2006). That is, the anti-retaliation provision protects an

---

[36] Plaintiff's deposition testimony reveals that she herself may have considered being written up for a dress code infraction and having her e-mails forwarded to be retaliatory actions. However, no where are those actions mentioned in the argument sections of Plaintiff's brief in opposition to the motion for summary judgment and so they are deemed abandoned and are not analyzed herein. However, the court notes that these actions would likely not rise to the level of adverse employment actions. *See Byrd v. Auburn Univ. Montgomery*, 268 Fed. Appx. 854 at **1 (11th Cir. March 10, 2008) (holding that the mis-assignment of discipline cases and being inadvertently left off e-mails are the ordinary tribulations of the workplace and petty slights which are not actionable).

Similarly, to the extent Plaintiff may have considered her placement on a Performance Improvement Plan to be retaliatory, such claim has not only been abandoned in her brief, but would nevertheless be unsuccessful as she was placed on the plan *before* she engaged in any statutorily protected expression. *See Gupta*, 212 F.3d at 587 (engaging in protected activity required to establish a *prima facie* case of retaliation).

individual not from all retaliation, but from retaliation that produces injury or harm. *See Rutledge v. Sun Trust Bank*, 262 Fed. Appx. 956, 958 (11th Cir. Jan. 18, 2008). The inquiry is individualized because the significance of any given act of retaliation will often depend on the particular circumstances. *See Taylor*, 196 Fed. Appx. at 802. But the acts must nevertheless be material and significant and not trivial. *See Rutledge*, 262 Fed. Appx. at 958; *see also Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001). The retaliation clause does not immunize an employee from those petty slights or minor annoyances that often take place at work and that all employees experience. *See Burlington*, 548 U.S. at 68.

Obviously, the termination of Plaintiff's employment constitutes an adverse employment action. The Written Warning similarly should be considered adverse because it was a contributing cause to the termination of Plaintiff's employment with the Credit Union. But the performance evaluation, which Plaintiff herself characterizes as "excellent," (*see* Doc. #30 at 20), cannot be considered adverse. The excellent performance evaluation did not produce an injury or harm, nor would a reasonable employee have found an excellent performance evaluation to be materially adverse. *See Byrd v. Auburn Univ. of Montgomery*, 268 Fed. Appx. 854 at **1 (11th Cir. March 10, 2008) ("[Plaintiff] was rated 'commendable' on her performance evaluation and received an 8.6% raise, and a reasonable employee would not have

44

found this performance evaluation materially adverse or have been dissuaded from making or supporting a charge of discrimination."). Therefore, the court's next task is to determine whether the Written Warning and/or termination of employment are causally related to the filing of the EEOC charge on October 5, 2007.

c.   **Causal Connection**

"In order to establish the requisite 'causal link' required as part of a *prima facie* case, a plaintiff need only establish that 'the protected activity and the adverse action were not wholly unrelated.'" *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *see also Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). The initial EEOC charge was filed on October 5, 2007, and less than three months later, Little was given a Written Warning for multiple transaction errors. (*See* Pl. Dep. at 216-17; *see also* Doc. #31, Exhs. 10, 11). Three months and five days after the EEOC charge was filed, Little's employment with the Credit Union was terminated. (*See* Pl. Dep. at 93, 196-97; *see also* Heffelfinger Dep. at 140-141, 147-48; Lyons Dep. at 228-29). While these are borderline substantial delays, a causal connection might nevertheless exist where there is some other evidence of causation. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (holding that a substantial delay between the protected activity and the negative employment action, where there is no other evidence of causation, is insufficient to establish a

45

causal connection); s*ee also Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361 (11th Cir. 2007) ("In opposing summary judgment, [plaintiff] failed to present evidence from which a reasonable jury could find any causal connection between her . . . complaints of sexual harassment and the termination of her employment three (3) months later."); *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1291 (11th Cir. 2000) ("[G]aps of time, standing alone, do not preclude a plaintiff from producing enough evidence for a reasonable jury to conclude that protected speech was a substantial factor in the [adverse employment decision]." ).  Because that inquiry merges with the pretext inquiry, the court is left to consider whether any articulated legitimate, nondiscriminatory reasons for the adverse employment actions might be pretext for discrimination.

### 2. Plaintiff's Failure to Rebut the Credit Union's Articulated Legitimate Nondiscriminatory Reasons for the Alleged Adverse Actions is Fatal to her Claims of Retaliation

#### a. The Written Warning

When the Credit Union issued Plaintiff a Written Warning on December 31, 2007, it reportedly did so because Plaintiff had incurred seven transaction errors, equaling more than two errors per week.  (*See* Heffelfinger Decl. at ¶ 7; *see also* Pl. Dep. at 216-217).  The Credit Union requires transaction errors to be kept at two or less per month.  (*See* Pl. Dep. at 189; *see also* Heffelfinger Dep. at 97, 229;

Heffelfinger Decl. at ¶ 6 and Exh. F to Heffelfinger Decl.).  Courts have consistently held such violations of work rules to be legitimate, non-discriminatory reasons for adverse actions.  *See Burdine*, 450 U.S. at 256.  Therefore, the Credit Union has met its burden of articulation, the presumption of discrimination is destroyed, and the burden shifts back to Little to show by a preponderance of the evidence that prohibited, retaliatory conduct motivated the decision to issue the Written Warning. *See Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950 (11th Cir. 2000).

To establish pretext, a plaintiff must "present concrete evidence in the form of specific facts" showing that the defendant's proffered reason was pretextual.  *See Bryant v. Jones,* 575 F.3d 1281, 1308 (11th Cir. 2009); *see also  Vessels v. Atlanta Indep. Sch. Sys.,* 408 F.3d 763, 771 (11th Cir.2005) (A plaintiff's evidence of pretext "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.").  "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it."  *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1088 (11th Cir.2004).  Conclusory allegations and assertions are insufficient. *See Bryant,* 575 F.3d at 1308.

As evidence of pretext, Plaintiff contends (without explaining) that the Written

Warning was a pretext for discrimination because: (1) Defendant gives conflicting and shifting reasons as to why Plaintiff was reprimanded; (2) Plaintiff should not have been issued the warning because the errors made were not exclusively her fault; (3) Heffelfinger waited a month to issue the reprimand when she was "required" to address each issue with Plaintiff when they occurred and; (4) Plaintiff was the only black employee at the branch.[37]  (*See* Doc. #30 at 71-75; *see also* Pl. Dep. at 183).

These arguments fail on a very basic level – they do nothing to address the fact that Little actually made the errors set out in the Warning.  While Plaintiff makes abundantly clear her disagreement with the wisdom of the Credit Union for disciplining her for errors that *partially* might have been the result of some contributory negligence, she does nothing to address the fact that the Credit Union believed Little committed the errors when it issued the Warning.  *See Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1341 (11th Cir. 2000); *see also Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (the pretext inquiry centers upon the employer's beliefs, and not the employee's own perceptions of her performance); *Harrison v. Int'l Business Machines (IBM) Corp.*, 2010 WL 1852589, Nos. 09-11762,

---

[37] To the extent Plaintiff attempts to argue pretext because she "complained on November 5, 2007 that Ms. Heffelfinger took no action to investigate Plaintiff's complaints," (*see* Doc. #30 at 75), that argument likewise fails because *none* of Plaintiff's informal complaints hinted that Plaintiff felt she was a victim of race discrimination at the hands of Heffelfinger.

09-11778 at *3 (11th Cir. May 11, 2010) ("[The employer's] legitimate, nondiscriminatory reasons for its actions were that [plaintiff] refused to complete work assignments, ignored parts of his assignments, refused to accept new assignments, engaged in altercations with coworkers, and refused to give any updates on the progress of his work. [Plaintiff] has not explained why these were not the true reasons for his poor performance reviews, denial of transfers, and eventual termination. [Plaintiff] simply cannot rebut the logical conclusion that . . . supervisors at [the company] took the actions they did because they honestly believed [plaintiff] to be a poor employee.").

The legitimacy of the Credit Union's reasons for issuing Little the Written Warning is further highlighted by the fact that, contrary to Plaintiff's assertions otherwise, the Credit Union consistently maintained that Plaintiff incurred seven transaction errors in one month and company policy requires errors to be kept at two or less per month.  (*See* Heffelfinger Decl. at ¶ 7; *see also* Pl. Dep. at 216-217 and Pl. Exh. 3 to Pl. Dep.).  While Heffelfinger did not sit down and counsel Little after the first or second error because "we don't do that the first time" (Heffelfinger Dep. at 237, 239-240), Munro's testimony does nothing to establish that the Credit Union

violated company policy in not so doing.[38]  *See Mitchell v. USBI Co.*, 186 F.3d 1352,

1355-56 (11th Cir. 1999) ("Even assuming that [the company] did deviate from its

policy, this deviation does not raise an inference of discrimination.  Standing alone,

_____

[38] Munro's testimony is as follows:

    Q:    You shouldn't hold issues and then write somebody up thirty days later, you should do it the minute you are aware of the problem; correct?

    A:    Correct.

    Q:    Likewise, for this 12-7-2007 issue, Birmingham branch supervisor was notified about an issue from the accounting department; is that correct?

    A:    Yes.

    Q:    And if Donna Leto and Nicole Heffelfinger were aware of this issue on 12-7-2007m Victoria [Little] should have been reprimanded on that date; is that correct?

    A:    She should have been made aware of it, yes.

    Q:    And that should have been documented somewhere in writing; correct?

    A:    Yes.

    . . .

    Q:    So before Victoria was given this written warning, there should be some documentation where she was reprimanded in writing on or around December 5th, December 7th, and December 10th; correct?

    MS. MILLER: Object to the form.

    A:    I don't – there should be something.

    Q:    Okay.
    A:    I don't know if it would be written.

(Munro Dep. at 232-233).

deviation from a company policy does not demonstrate discriminatory animus.").

Finally, Little's own belief that her status as the only black employee in the office had something to do with the discipline is ungrounded in factual support and merely her own perception. *See Kelliher v. Veneman*, 313 F.3d 1270, 1276 n. 8 (11th Cir. 2002) (plaintiff's assertion that his supervisor was "out to get him" did not prove pretext for age or race discrimination). Such conclusory allegation is, of course, insufficient to establish pretext. *See also Thomas v. Miami Veterans Med. Cntr.*, 290 Fed. Appx. 317, 320 (11th Cir. Aug. 26, 2008) (conclusory allegations insufficient to support pretext); *see also Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (conclusory allegations, without more, are insufficient to show pretext).

Because Plaintiff has failed to establish that the Written Warning she received for multiple transaction errors was a pretext for unlawful discrimination, her retaliation claim based on the Warning fails. Defendant Credit Union is entitled to summary judgment on that claim.

### b.    The Termination of Little's Employment

The Credit Union terminated Little's employment on January 10, 2008, after Little failed to bank the branch, initially denied the error, and then sent an insubordinate e-mail to Heffelfinger after it was confirmed that Little had in fact

committed the error.  (*See* Heffelfinger Dep. at 128-130, 134, 148-149 and Exh. 18 to Heffelfinger Dep.; *see also* Heffelfinger Decl. at ¶ 8 and Exh. H to Heffelfinger Decl.; Pl. Dep. at 93-94).  Since courts have consistently held the violation of work rules as legitimate, non-discriminatory reasons for discharge, the burden shifts back to Little to show that retaliation more likely motivated the decision to terminate her employment than did the violation of the work rule.  *See Burdine*, 450 U.S. at 256.

As evidence of pretext, Plaintiff contends (without explaining) that the termination of her employment was a pretext for discrimination because: (1) Defendant gives conflicting and shifting reasons as to why Plaintiff was terminated; and (2) Plaintiff complained on November 5, 2007 that Heffelfinger was taking no action to investigate her complaints.  (*See* Doc. #30 at 71-75; *see also* Pl. Dep. at 183).  The problem with both of these pretext arguments is that they do nothing to rebut the Credit Union's contention that Little made an error, initially denied the error, and then was insubordinate about being confronted with the error.  *See Laosebikan v. Coca-Cola*, 167 Fed. Appx. 758, 764 (11th Cir. Jan. 31, 2006) (holding that plaintiff did not establish pretext in retaliation where the company said that it terminated plaintiff because of insubordination and had evidence of the insubordination); *see also Robinson v. LaFarge North America, Inc.*, 240 Fed. Appx. 824, 829 (11th Cir. June 19, 2007) (holding that where defendant employer had

evidence that plaintiff deliberately caused damage to equipment, there was insufficient evidence of pretext); *Clark v. Potter*, 232 Fed. Appx. 895, 897-898 (11th Cir. April 30, 2007) (holding that because plaintiff did not dispute the factual basis for the adverse action, summary judgment was appropriate on the retaliation claim); *Thomas v. Miami Veterans Med. Cntr.*, 290 Fed. Appx. 317, 320 (11th Cir. Aug. 26, 2008) (where employer stated it fired plaintiff for failure to follow supervisory instructions, wilful resistance to the instructions, and disrespectful conduct, and the record indicated no evidence, as opposed to conclusory allegations, that the employer fired plaintiff for any reasons other than legitimate, nondiscriminatory reasons, retaliation claimed failed).  Moreover, there is absolutely nothing in the record to support Little's contention that the Credit Union gave shifting or inconsistent reasons in support of the termination decision,[39] nor is there anything to suggest that

---

[39]  Plaintiff's statement of the facts makes much ado about the fact that Leto and Munro articulated additional, and not always consistent, reasons as to why Plaintiff's employment with the company was terminated.  In fact,  Munro did testify that Little's employment with the company was terminated because of the errors listed in the Written Warning, because she wasn't keeping accurate time, and because she failed to bank the branch, and Leto did testify that Little's employment was terminated as a result of the seven errors listed in the Written Warning.  (*See* Munro Dep. at 198, 213, 220; *see also* Leto Dep. at 9).  But the testimony of Munro and Leto is unimportant -- it is undisputed that neither Munro nor Leto made the decision to terminate Little's employment.  (*See* Pl. Dep. at 93; *see also* Leto Dep. at 13).

Heffelfinger (upon consultation with Lyons) is the one who actually terminated Plaintiff's employment, and she has consistently stated that Plaintiff's employment was terminated because of her failure to bank the branch and the inappropriate and insubordinate e-mail which followed shortly thereafter.  (*See* Doc. #30 at 62-63, ¶ 149; *see also* Heffelfinger Dep. at 127-134, 141-142, 148-149, 357-359 and Exh. 18 to Heffelfinger Dep.).

Heffelfinger or Lyons were motivated by race when coming to the decision to terminate Little's employment.[40]

Because Plaintiff has failed to establish that the termination of her employment was a pretext for unlawful discrimination, her retaliation claim based on termination fails. Defendant Credit Union is entitled to summary judgment on that claim.

## V.  **Conclusion**

For the reasons asserted above, there being no dispute as to any material fact, Defendant IBM Southeast Employees' Federal Credit Union's Motion (Doc. #24) for Summary Judgment is due to be granted.[41]

A separate order will be entered dismissing all claims.

**DONE** this the ___1st___ day of July, 2010.

_____
SENIOR UNITED STATES DISTRICT JUDGE

---

[40] *See* footnote 37, *supra*.

[41] The court cautions counsel for Plaintiff that the concluding paragraph of Plaintiff's brief in opposition to the motion for summary judgment came close to crossing the line. Defendant's motion for summary judgment was hardly "frivolous" or "slapped together, bare bones." (*See* Doc. #30 at 76). Those who live in glass houses should not throw stones.